UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RUTH VAN DER MAAS,

    Plaintiff,                                              Hon. Wendell A. Miles

v.                                                                Case No. 1:04-CV-455

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/


**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 54 years of age as of the date her insured status expired.  (Tr. 57).  She earned a Master's Degree (and completed the coursework for a Ph.D.) and worked previously as an assistant professor, editor, census crew leader, and precinct inspector.  (Tr. 150, 550, 765-71).

Plaintiff applied for benefits on April 1, 1997, alleging that she had been disabled since March 1, 1995, due to fibromyalgia, asthma, probable chronic fatigue and immune dysfunction, reconstructed right knee and left ankle, hypothyroidism, possible multiple connective tissue disorder, and possible somatoform disorder.  (Tr. 57-59, 71, 88).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 37-56).

On April 13, 1999, Plaintiff appeared before ALJ John Murphy, with testimony being offered by Plaintiff and her husband.  (Tr. 507-35).  In a written decision dated May 26, 1999, the ALJ determined that because Plaintiff could perform her past relevant work as a professor she was not disabled.  (Tr. 17-29).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 7-9).  On October 15, 2000, Plaintiff initiated an action in federal court challenging the Commissioner's decision.  (Tr. 564-66). On September 5, 2001, the parties stipulated to remand the matter to the Commissioner for a new hearing at which a vocational expert would testify regarding Plaintiff's ability to perform her past relevant work.  (Tr. 573-81).

On May 17, 2002, Plaintiff appeared before ALJ Sharon Bauer, with testimony being offered by Plaintiff, medical expert Jeffery Andert, Ph.D., and vocational expert Michael Simons. (Tr. 756-810). In a written decision dated September 19, 2002, the ALJ determined that while Plaintiff was unable to perform her past relevant work she was nonetheless not disabled because there existed a significant number of jobs which she could perform despite her limitations. (Tr. 549-59). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 536-39). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

The Court further notes that Plaintiff's insured status expired on December 31, 1998. (Tr. 550). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **MEDICAL HISTORY**

On June 7, 1989, Plaintiff participated in psychological testing conducted by Richard Vaughn, Ph.D. (Tr. 234-36). This examination revealed that Plaintiff "is an immature and insecure woman who has egocentric needs for attention, affection, and sympathy which render her quite dependent." (Tr. 235). The doctor also noted that while Plaintiff "portrays herself as outgoing and socially extroverted," this "is likely to be somewhat shallow and superficial, lacking in genuine emotional involvement and may at times be somewhat exploitive in the service of her dependency needs." *Id.* Dr. Vaughn further observed that Plaintiff employed "prominent somatic defenses" which would provide her with "a secondary gain by allowing her to adopt a dependent role without

the 'shame.'" (Tr. 234). As the doctor described it, "it is easier to be dependent if one is physically ill than if one is emotionally upset." Plaintiff was diagnosed with somatoform disorder with anxiety and mild depression with histrionic personality. (Tr. 235).

On February 15, 1994, Plaintiff fractured her left ankle requiring surgery. (Tr. 262). A March 30, 1994 examination of Plaintiff's ankle revealed "good signs of early healing" and "maintenance of good position." (Tr. 261). When examined on June 14, 1994, Plaintiff reported that her ankle "does well unless she does a lot of walking on hard surfaces. . .otherwise, she does quite well." (Tr. 260). Plaintiff exhibited normal range of motion without pain or discomfort. *Id.* A September 7, 1994 examination revealed that Plaintiff's ankle was "doing very well." (Tr. 259). Plaintiff was "doing well" and was able to ambulate "with no problems." X-rays of Plaintiff's ankle revealed that it was "healed." *Id.*

On October 5, 1995, Plaintiff's treating physician, Dr. John Walen, reported that Plaintiff "continues with multiple vague somatic complaints in addition to her (few) real symptoms - I can't quite convince her to follow up with counseling for what I presume is a somatization disorder." (Tr. 328).

On August 8, 1996, Plaintiff was examined by Dr. Raymond Gonzalez. (Tr. 265-67). Plaintiff reported that she was "chronically fatigued" and was experiencing lightheadedness and cognitive deficiencies. (Tr. 265). She reported that "she has had a tendency to fall for no apparent reason" as well as "a tendency to drop things." *Id.* Plaintiff also reported that she had experienced blackouts and various paresthesias. (Tr. 265-66). The doctor noted that a recent neurologic evaluation was "unrevealing" to which Plaintiff responded that "it was not thorough enough." *Id.*

The results of Dr. Gonzalez's examination were "unremarkable." (Tr. 266). The results of a subsequent MRI examination of Plaintiff's brain were "normal." (Tr. 332).

On September 13, 1996, Plaintiff was examined by Dr. Richard Goodstein. (Tr. 353-57). Plaintiff detailed a "quite complex" medical history, including lupus, various arthralgias, seasonal facial rashes, light headedness, back pain, shingles, fibromyalgia, sleep disorder, asthma, chronic fatigue syndrome, hypertension, pneumonia-related hemoptysis, chest pain, irritable bowel syndrome, and nasal drainage. (Tr. 353-54). The results of an examination were unremarkable. (Tr. 356). Dr. Goodstein concluded that he "would strongly encourage evaluation by clinical psychology." *Id.*

On January 21, 1997, Plaintiff was examined by Dr. Amanda Huver. (Tr. 362). Plaintiff reported that she was suffering from "multiple chronic complaints" which "took over an hour to elicit." Plaintiff's main complaint, however, was that she was suffering from "chronic fatigue that worsens with exercise." *Id.* The results of an examination were unremarkable. (Tr. 363). Dr. Huver concluded that "most of [Plaintiff's] symptoms can be explained with medical illnesses other than CFS [chronic fatigue syndrome]," a conclusion with which Plaintiff disagreed. (Tr. 367-68). The doctor recommended that Plaintiff "undergo psychological evaluation." (Tr. 367).

On May 5, 1997, Plaintiff participated in a consultive examination conducted by Arthur Jongsma, Ph.D. (Tr. 396-99). Plaintiff reported that she was unable to work because of "fatigue, muscle spasms and fibromyalgia." (Tr. 396). As the doctor reported, Plaintiff "wanted to go on to list many other symptoms as she removed a typewritten document of many pages from a file folder." *Id.* Plaintiff reported that she and her husband "are quite socially active and especially have a close relationship with a couple of their neighbors." (Tr. 397). Plaintiff reported that she is

"quite active with the Grand Rapids Symphony as she sings in the symphonic chorus and volunteers for the symphony." She indicated that she attends church and practices with the chorus weekly and volunteers as a counselor one night each week. *Id.*

Plaintiff stated that she "arises at 6:30 a.m. and does some computer work, primarily word processing," after which she "does stretching exercises and makes telephone contacts." (Tr. 398). Plaintiff reported that she has "been busy recently organizing a for[u]m on fibromyalgia that will take place at Aquinas College." She indicated that she also performs "housework, crafts and a little gardening through the day." The results of a mental status examination were unremarkable. (Tr. 398-99). As the doctor concluded:

> Other than [Plaintiff's] preoccupation with her physical and cognitive symptoms that she described, she was a normal functioning individual who has considerable intellectual capacity. In spite of her complaints about cognitive deficits, she showed no evidence of that during the Sensorium and Mental Capacity section of the interview. She does seem to exaggerate her physical and cognitive problems.

(Tr. 399). Plaintiff was diagnosed with undifferentiated somatoform disorder and her GAF score was rated as 60. *Id.*

On December 4, 1997, Plaintiff was examined by Dr. Yelena Yavich. (Tr. 422). The doctor reported that Plaintiff "continues to have her usual symptoms of fibromyalgia and chronic fatigue." Plaintiff also reported that "even minimal exercise" causes her to experience shortness of breath. An examination revealed that Plaintiff "is doing quite well." The doctor concluded that Plaintiff's shortness of breath "could be related to just plain deconditioning." *Id.*

On March 7, 1998, Plaintiff completed a questionnaire regarding her activities. (Tr. 138-49). Plaintiff reported that she cooks, washes laundry, gardens, dusts, mops, washes dishes,

7

shops, performs household repairs, reads, watches television, sews, swims, completes puzzles, plays computer games, sings, makes jewelry, visits with friends and family, walks her dog, participates in church activities, and participates in the symphony chorus. (Tr. 139-48).

On November 5, 1998, Plaintiff participated in an allergy evaluation conducted by Dr. Richard Townley. (Tr. 450-52). The results of an examination were unremarkable and the doctor concluded that Plaintiff was experiencing "probable mild asthma with multiple symptomatic complaints, perhaps, related to a somatization disorder, and significant sleep disorder." *Id.*

In December 1998, Plaintiff participated in a series of examinations and evaluations at the Mayo Clinic. (Tr. 466-88). The results of Plaintiff's "extensive workup" revealed the following:

1. Fatigue: Plaintiff complained of fatigue, but "no clear-cut cause of the fatigue was found in the testing that was performed. She did not have trigger points to suggest fibromyalgia or similar causes."

2. Somatization Disorder: The results of a psychiatric evaluation "suggested the diagnosis of somatization disorder" for which counseling was recommended.

3. Hypertension: However, various examinations revealed "no significant abnormalities."

4. Positive Anti-Phospholipid Antibody and ANA: The results of an ANA test were "positive but not markedly positive." Doctors further noted that "[d]espite the positive laboratory tests, [Plaintiff] does not have clinical features to suggest SLE [lupus] or anti-phospholipid syndrome. The fatigue is consistent with SLE, but she does not have other features."

5. Possible Asthma.

6. Probable Vocal Cord Dysfunction.

8

(Tr. 468).

On March 25, 1999, Plaintiff participated in an exercise stress test, the results of which revealed no evidence of abnormality. (Tr. 499).

On April 20, 1999, Daniel DeWitt, Ph.D., authored a letter describing his treatment of Plaintiff. (Tr. 500-01). The doctor reported that he began treating Plaintiff on December 17, 1998, and met with her a total of nine times. (Tr. 500). According to Dr. DeWitt, Plaintiff's "thinking is preoccupied with multiple physical symptoms and theories to explain them." *Id.* Psychological testing revealed that Plaintiff needs "attention and affection." (Tr. 501). The doctor noted that "[i]t is expected that [Plaintiff's] reaction to stress will be to develop physical symptoms." The doctor further stated that "[i]ndividuals with this profile typically do not identify their problems as psychological in nature, but rather present with complaints about physical problems." Dr. DeWitt concluded that Plaintiff suffered from undifferentiated somatoform disorder. *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

The ALJ found that Plaintiff suffers from somatoform disorder and mild arthritis of the right knee, severe impairments which neither alone nor in combination, satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 551). The ALJ further determined that there existed a significant number of jobs which Plaintiff could perform despite her limitations. (Tr. 551-57). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

#### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

---

made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of the date her insured status expired Plaintiff retained the capacity to perform work activities subject to the following limitations: (1) no lifting, carrying, pushing, or pulling more than 20 pounds occasionally and 10 pounds frequently, (2) she can perform only simple, unskilled, repetitive routine tasks, (3) she can sit, stand, and walk at least six hours each in an 8-hour workday, (4) she experiences moderate limitations in the ability to understand, remember, and carry out detailed instructions, and (5) she experiences moderate limitations in the ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms. (Tr. 555-56). After reviewing the relevant medical evidence, the undersigned concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could no longer perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform

11

specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michael Simons.

The vocational expert testified that there existed approximately 15,000 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 806-08). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

      a.   The ALJ properly applied the Grids

The medical-vocational guidelines, also known as the "grids," consider four factors relevant to a particular claimant's employability: (1) residual functional capacity, (2) age, (3) education, and (4) work experience. 20 C.F.R., Part 404, Subpart P, Appendix 2. Social Security regulations provide that "[w]here the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00. In other words, a claimant may be awarded benefits if she satisfies

the requirements of one of the particular rules correlating to a finding of disability. *See Russell v. Commissioner of Social Security*, 20 F. Supp.2d 1133, 1134 (W.D. Mich. 1998).

Pursuant to the grids, a claimant 54 years of age is considered to be "closely approaching advanced age," whereas a claimant 55 years of age is considered to be of "advanced age." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201.00(f)-(g). As of the date her insured status expired Plaintiff was 54 years of age - 55 days short of her 55th birthday. Plaintiff asserts that despite the fact that she was only 54 years of age as of the date her insured status expired, the ALJ improperly failed to consider her to be of "advanced age." Plaintiff further asserts that if considered to be of "advanced age" a finding that she is disabled would be mandated by the grids.

While the ALJ did not rely on the grids in making her decision, she concluded that Plaintiff fit within the framework of Rule 202.14, the provision for claimants "closely approaching advanced age" whose prior work experience is "skilled or semi-skilled," but is not transferable to jobs within her RFC. 20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 202.14. Pursuant to this particular Rule, Plaintiff is considered "not disabled." *Id.* If Plaintiff were considered to be of "advanced age," however, she would be considered disabled. 20 C.F.R., Part 404, Subpart P, Appendix 2, Rule 202.06.

When utilizing the grids, the claimant's age as of the date her insured status expired governs. *See* Curtis *v. Secretary of Health and Human Services*, 1989 WL 83869 at *3 (6th Cir., July 28, 1989). As noted above, as of the date her insured status expired, Plaintiff was less than two months away from her 55th birthday. The regulations further indicate, however, that in a "borderline situation," the age categories are not to be applied "mechanically." 20 C.F.R. § 404.1563(a). While the regulations do not define the phrase "borderline situation," guidance is provided by two Appeals

Council interpretations contained in the SSA Hearings, Appeals and Litigation Law Manual ("HALLEX"). *See Russell*, 20 F. Supp.2d at 1134. These two interpretations provide the following:

> First, in Appeals Council Interpretation II-5-3-2 (effective Mar. 16, 1979), the issue presented is "[h]ow far in advance of attainment of a specific age category . . . may [the grids] pertinent to that category be applied?" In its interpretation, the Appeals Council states that "[g]enerally, establishing an onset date up to six months prior to attainment of the specified age would be reasonable."
>
> Interpretation II-5-3-2(A)(effective Nov. 2, 1993), answers the question "[w]hat is a borderline age situation and what factors should be considered when determining whether to use a higher age than a claimant's chronological age when applying [the Grids]?" The Interpretation states that:
>
>> To identify borderline age situations when making disability determinations, adjudicators will apply a two-part test:
>> (1) Determine whether the claimant's age is within a few days or a few months of a higher age category.
>> (2) If so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled."
>>
>> If the answer to one or both is "no," a borderline age situation either does not exist or would not affect the outcome. The adjudicator will then use the claimant's chronological age.
>>
>> If the answer to both is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the claimant's chronological age. (Use of the higher age category is not automatic.)
>
> *Russell*, 20 F. Supp.2d at 1135.

Several other courts have addressed this issue. *See Leyba v. Chater*, 983 F. Supp. 1048 (D.N.M. 1996) (three-and-one-half months presents a borderline situation); *Davis v. Shalala*, 883 F. Supp. 828 (E.D.N.Y. 1995) (three months is borderline); *Hill v. Sullivan*, 769 F. Supp. 467 (W.D.N.Y. 1991) (three months and two days borderline); *Roush v. Heckler*, 632 F. Supp. 710 (S.D.

14

Ohio 1984) (six months is borderline); *see also, Daniels v. Apfel*, 154 F.3d 1129 (10th Cir. 1998) ("a borderline situation exists when there would be a shift in results caused by the passage of a few days or months"); *but see*, *Lambert v. Chater*, 96 F.3d 469 (10th Cir. 1996) (seven months not borderline).

Considering this authority, the Court finds that Plaintiff's situation, indeed, presents a "borderline situation." In such a situation, the ALJ is required to make a factual determination as to the appropriate age category to apply; to do otherwise "is to mechanically apply the age categories, an action prohibited by 20 C.F.R. § 404.1563.(a)." *Russell*, 20 F. Supp.2d at 1135. The rule that the "age categories are not to be applied mechanically," however, "does not mean that Plaintiff must be moved mechanically to the next age category whenever his age is close to that category." *Crady v. Secretary of Health and Human Services*, 835 F.2d 617, 622 (6th Cir. 1987). In fact, as recognized in Appeals Council Interpretation II-5-3-2:

> Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age - even when the time period is only a few days.

Application of the Medical-Vocational Guidelines in Borderline Age Situations, available at, http://www.ssa.gov/OP_Home/hallex/II-05/II-5-3-2.html (last visited May 31, 2005).

Correctly recognizing that Plaintiff's circumstance presented such a borderline situation, the ALJ did not mechanically place Plaintiff in the younger age category, but instead analyzed the relevant facts and determined that "it is not appropriate to consider [Plaintiff] to be an individual of advanced age on her date last insured for benefits." (Tr. 556). As the ALJ correctly observed, Plaintiff's condition did not deteriorate until after the expiration of her insured status. The ALJ also noted the fact that Plaintiff performed substantial gainful activity subsequent to the

expiration of her insured status. (Tr. 551). In sum, the ALJ did not mechanically place Plaintiff in the younger age category, but instead articulated a rationale for her decision which is supported by substantial evidence. Plaintiff has failed to present evidence of "additional adversity" justifying placing her in the higher age category.

b. The ALJ Properly Evaluated Plaintiff's Impairments

As noted above, the ALJ concluded that Plaintiff suffered from several severe impairments. Plaintiff asserts that the ALJ erred by failing to also find that she suffers from chronic fatigue syndrome and left ankle fracture.

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment does not constitute reversible error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Ortiz-Rosado v. Comm'r of Soc. Sec.*, 2001 WL 700835 at *1 (6th Cir., June 12, 2001).

Here, the ALJ determined that Plaintiff suffered from severe impairments at step two of the sequential analysis and continued with the remaining steps thereof, noting that she gave "careful consideration" to "the entire record." (Tr. 557). This sufficiently indicates that the ALJ properly considered the combined effect of Plaintiff's various impairments. *See Loy v. Sec'y of*

*Health and Human Services*, 901 F.2d 1306, 1310 (6th Cir. 1990) (citing *Gooch v. Sec'y of Health and Human Services*, 833 F.2d 589, 591-92 (6th Cir. 1987)).

As the ALJ observed, the record fails to support that Plaintiff suffers from chronic fatigue syndrome and, furthermore, there exists no evidence that Plaintiff suffered from a severe impairment of the left ankle as of the date her insured status expired. However, even were the Court to conclude otherwise, such does not call into question the substantiality of the evidence supporting the ALJ's decision. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").[2]

c. Plaintiff's Remaining Arguments

Plaintiff's final two arguments are likewise unavailing. She first argues that the ALJ erred by taking into consideration evidence predating and postdating her alleged onset date. As the record in this matter reveals, Plaintiff has a lengthy and voluminous history of seeking treatment and

---

[2] The Court is aware of the Sixth Circuit's recent decision in *Wilson v. Commissioner of Social Security*, 378 F.3d 541 (6th Cir. 2004), in which the court rejected the application of the "harmless error" doctrine as applied to an error committed by an ALJ. The present circumstance, however, is easily distinguishable. In *Wilson*, the court found improper the application of the "harmless error" doctrine only as to errors which constituted the "denial of a mandatory procedural protection." *Id.* at 544-46. The alleged error committed by the ALJ in this instance is not procedural in nature and as the *Wilson* court recognized does not come within the scope of its decision. *Id.* at 547-48.

evaluation for her many alleged impairments. To fully understand the nature of Plaintiff's impairments and the extent to which such impact her ability to function it is necessary to examine the entire record. The ALJ did not unduly rely on such information, however, as the evidence from the relevant time period is more than sufficient to support her decision in this matter.

Finally, Plaintiff complains that the ALJ improperly cancelled a supplemental hearing. Following the second administrative hearing in this matter, the Commissioner scheduled a supplemental hearing, the stated purpose of which was to permit further questioning of the vocational expert. (Tr. 624). This hearing was subsequently cancelled and the ALJ's decision issued shortly thereafter. Plaintiff asserts that cancellation of this hearing necessitates a remand.

As Plaintiff recognizes, however, she was not entitled to a supplemental hearing. More importantly, Plaintiff has neither asserted nor proven that she was in any way prejudiced by the cancellation of this supplemental hearing. As evidenced by the voluminous record, the ALJ fully developed the record in this matter. Moreover, the ALJ questioned at length the vocational expert at the second administrative hearing. The Court discerns no error and Plaintiff has identified no authority suggesting otherwise.

## **CONCLUSION**

As articulated herein, the Court concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure

to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: June 2, 2005                                        /s/ Ellen S. Carmody
                                                          ELLEN S. CARMODY
                                                          United States Magistrate Judge